IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE, COMMISSION, | § § § | |
| Plaintiff, | § § | Civil Action No. 3:09-CV-2304-D |
| VS. | § § | |
| STRIKER PETROLEUM, LLC, et al., | § § | |
| Defendants. | § § | |

MEMORANDUM OPINION
AND ORDER

In this enforcement action brought by the Securities and Exchange Commission ("SEC"), the court-appointed receiver ("Receiver") applies for an award of professional fees and expenses. Although the SEC does not object to the fee application, certain investors (the "Objecting Investors") do object. Because the court concludes that the Receiver has acted reasonably and diligently and that the requested fees and expenses are reasonable given all the circumstances surrounding the receivership, the court grants the application.

I

This is the Receiver's third application for fees and expenses; the court granted the prior two in their entirety.[1] In the instant application, the Receiver seeks fees in the sum of

---

[1] The court granted the Receiver's first application for payment of professional fees and expenses, which requested $146,227.50 in fees and $2,575.84 in expenses for the Receiver and Munsch Hardt Kopf & Harr, P.C. ("Munsch Hardt"). Oct. 13, 2010 Order at 1. The court also granted the Receiver's second application for payment of professional fees and expenses, which requested $159,661.50 in fees and $7,611.00 in expenses for the Receiver and Munsch Hardt, and $9,909.13 in fees and $63.60 in expenses for Williams &

$412,341.00 and expenses in the sum of $10,831.68 for the Receiver and the law firm of Munsch Hardt Kopf & Harr, P.C. ("Munsch Hardt"). The Receiver also requests an award of $98.00 in fees for the law firm of Williams & Anderson PLA ("Williams & Anderson"), whom the Receiver retained to provide local counsel in Little Rock, Arkansas. The application covers services rendered during the period June 15, 2010 through September 15, 2011.

The Receiver asserts that, during this period, he increased the receivership estate by $1.5 million in production proceeds, resulting in a total recovery of over $5 million, and "moved from gathering assets to working through their proper disposition." R. Br. 2-3. In particular, he maintains that he formulated and implemented a strategy to distribute assets by, *inter alia*, preparing the First, Second, and Third Interim Reports; discussing approaches with investor counsel and individual investors; maintaining a website to explain reports to investors; preparing motions, such as the motion to approve interim distributions and the motion seeking approval to sell and/or turn over program assets to a successor trustee; and responding to the debenture holders' challenges regarding the receivership estate's lack of assets, including through a hearing to explain conclusions and answer questions.

The Objecting Investors are investors in four programs (collectively, the "Objectors'

---

Anderson PLA. Dec. 7, 2010 Order at 1. Thus the total requested fees, including amounts requested in the first and second applications, is $749,319.25.

Programs").[2] They present a number of objections to the fee application that can be reduced to the following arguments.

- The narratives in the Receiver's billing statements are vague.

- The Receiver has failed to adequately segregate fees and expenses incurred by each program or offering, suggesting that he seeks to apply his requested fees and expenses against the revenue from the Objectors' Programs, which would be unreasonable and unjustified for these reasons: (1) the Objecting Investors' ownership of the working interests, and revenue produced therefrom, in the Objectors' Programs preclude the Receiver from including these assets in the receivership estate; (2) minimal fees and expenses were necessary to manage the Objectors' Programs because the sole benefit the Receiver obtained in favor of the Objecting Investors was the diversion of revenue payments from Llano Consolidated Resources to the Receiver; (3) once the Receiver obtained the revenue from the Objectors' Programs, he was obligated to distribute it and relinquish management, as the Objecting Investors requested, but he instead continued to collect and withhold the revenue while pursuing assets for the Option Plus Program[3] and the debenture offerings, when there was no potential

---

[2]These programs are the Striker Legacy Interests, Amber Property LLC; Striker Legacy Interests, Brittany Property LLC; Striker 2005 Rework Program; and Striker Legacy Interests, CJ Property LLC.

[3]Although the Objecting Investors call this program the "Options Plus Program," it appears that it is actually called the "Option Plus Program."

> benefit to the Objectors' Programs, and the Option Plus Program and debenture offerings resulted in no net revenue, in an apparent effort to protect himself in case his efforts proved fruitless; and (4) despite the Receiver's work as the operator and/or manager for the C&B Energy Income Program 2004 and C&B Energy Income Program 2005 (collectively, the "C&B programs") and in the turnover of these programs to C&B Energy Management, LLC ("C&B Energy"), no part of the Receiver's legal fees has been borne by the C&B programs.

In response to the vagueness objection, the Receiver maintains that the billing statements provide the date, name of the professional, hours spent, rate, and description of services rendered. Regarding the request for segregation, the Receiver contends that segregation is not required. To the extent the court finds it useful in considering the equitable allocation of fees and expenses, the Receiver maintains that he has segregated the fees incurred for each program or offering and has demonstrated that such fees may be offset against the recovery for each program or offering.[4]

---

[4]This disputes the Objecting Investors' contention that the Option Plus Program and the debenture offerings produced "no net revenues" or are "worthless." *See* Objecting Investors Br. 2, 5-6 (emphasis omitted).

The Receiver's position is illustrated by the following chart:

| Program or Offering | Fees Incurred | Value Recovered |
|---|---|---|
| Option Plus Program | $40,517.00 | $102,276.00 |
| Debenture Offerings | $40,646.00 | $323,305.00 |
| C&B Programs | $21,783.00 | Undetermined |

*See* R. Reply Br. 5-6, 12.[5] Regarding the Option Plus Program, the Receiver maintains that, after obtaining leave of court to conduct an auction, the program received a high bid of $102,276.00. Assuming the sale is successful, 37%,[6] or $37,842.00, is expected to be retained by the receivership estate, and the majority of the $40,517.00 Option Plus fees can be paid from this sum. The Receiver offers either to waive the difference of $2,675.00, if appropriate, or to seek to recover the balance before completing the distribution of funds. The Receiver also states that he holds $64,661.00 of debenture cash assets, and that $40,646.00 in debenture fees can be paid from this cash sum. For the C&B programs, the Receiver contends that, when he requested court approval to turn over to C&B Energy

---

[5]For the debenture offerings, the court has combined the fees incurred for debenture due diligence, debenture trustee communications, and the debenture hearing (i.e., $37,425.00) with the MSB (i.e., $3,221.00). *See* R. Reply Br. 5-6, 9, 12.

[6]According to the Receiver's September 9, 2011 motion to conduct auction sale of Option Plus interests and to abandon managerial duties to the Option Plus Program, the Receiver requested approval to conduct an auction of the Llano Consolidated Resources, LLC Option Plus interests ("Llano Option Plus Interests") and the Investor Option Plus interests for the investors who authorized a sale. *See* R. Mot. to Conduct Auction 7. The Receiver contends that these interests in the Option Plus Program assets total 76.21%—37.18% of which are the Llano Option Plus interests and 39.03% of which are the relevant Investor Option Plus interests. *Id.* at 7-8. The court granted the Receiver's motion. *See* Oct. 14, 2011 Order at 1.

operating assets that had an undetermined value, he made clear that he would not withhold assets to offset fees incurred for the C&B programs,[7] and the Objecting Parties did not raise an issue then. But he stated that if it were necessary to allocate the fees of $21,783 to the C&B programs, he might seek to recover these funds from C&B Energy, who continues to manage these assets.

The Receiver also segregates $84,670 of fees incurred for "Claims, Website, Investor Communications," without noting whether these are related to all or to a specific program or offering. *Id.* at 9. He seeks $225,930 that is not allocated to the revenue of a specific program or offering.

II

"The award of fees in a receivership is entrusted to the discretion of the district court." *Commodity Futures Trading Comm'n v. Am. Metals Exch. Corp.*, 991 F.2d 71, 79 (3d Cir. 1993) (citing *SEC v. Capital Counsellors, Inc.*, 512 F.2d 654, 658 (2d Cir. 1975)); *see also, e.g., Stuart v. Boulware*, 133 U.S. 78, 82 (1890) (recognizing discretion of "court of equity"). "A receiver appointed by a court who reasonably and diligently discharges his duties is entitled to be fairly compensated for services rendered and expenses incurred." *SEC v. Byers*, 590 F.Supp.2d 637, 644 (S.D.N.Y. 2008); *see also SEC v. Elliott*, 953 F.2d 1560,

---

[7]The Receiver also clarifies that, although the receivership estate retained $50,000 when turning over the C&B programs, it did so for "administrative expenses," because "[t]he receivership estate expended $50,000 to restart and stabilize operations of the two C&B programs" and "[t]he purpose of [the $50,000 retention] [was] not to pay the Receiver himself, but rather to restore the receivership funds expended as a result of the overall effort made by the Receiver." R. Reply Br. 12-13 (quoting R. Mot. Approve Turnover at ¶¶ 9, 12).

1577 (11th Cir. 1992) ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation.") (citing *Donovan v. Robbins*, 588 F. Supp. 1268, 1273 (N.D. Ill. 1984)).

"In general, a reasonable fee is based on all circumstances surrounding the receivership." *SEC v. W. L. Moody & Co., Bankers (Unincorporated)*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd*, 519 F.2d 1087 (5th Cir. 1975); *see Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994) ("[T]he court may consider all of the factors involved in a particular receivership in determining an appropriate fee." (citing *Donovan*, 588 F. Supp. at 1273)). "In determining the amount of their compensation, due consideration should be given to the amount realized, as well as the labor and skill needed or expended, and other circumstances having a bearing on the question of the value of the services." *City of New Orleans v. Malone*, 12 F.2d 17, 19 (5th Cir. 1926). While recognizing that courts have relied upon myriad factors in determining the reasonableness of a receivership fee,[8] this court will follow

---

[8] *See, e.g., Stuart*, 133 U.S. at 82 ("The compensation is usually determined according to the circumstances of the particular case, and corresponds with the degree of responsibility and business ability required in the management of the affairs intrusted to him, and the perplexity and difficulty involved in that management."); *United States v. Code Prods. Corp.*, 362 F.2d 669, 673 (3d Cir. 1966) ("In allowing fees 'the considerations are the time, labor and skill required, but not necessarily that actually expended, in the proper performance of the duties imposed by the court upon the receivers, the fair value of such time, labor and skill measured by conservative business standards, the degree of activity, integrity and dispatch with which the work is conducted and the result obtained.'") (quoting *Croskery v. Roberts & Mander Corp.*, 200 F.2d 150, 154 (3d Cir. 1952)); *Byers*, 590 F.Supp.2d at 644 ("These factors include, *inter alia*, 'the complexity of problems faced, the benefits to the receivership estate, the quality of the work performed, and the time records presented.'") (quoting *SEC*

the approach of *W. L. Moody* and consider factors that are particularly significant due to the circumstances of this case and are derived from factors examined by the Fifth Circuit and other courts: (1) the complexity of the problem faced by the receivership; (2) the ability, reputation and professional qualities of the receiver and assisting professionals necessary for the job; (3) the time and value of the labor necessarily expended; (4) the results achieved; and (5) the ability of the receivership estate to afford the requested fees and expenses. *See W. L. Moody*, 374 F. Supp. at 480-83.[9] Additionally, "opposition or acquiescence by the SEC to the fee application will be given great weight." *Byers*, 590 F.Supp.2d at 644 (alteration omitted) (quoting *SEC v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973)).[10]

---

*v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973)).

[9]In *W. L. Moody* the court recognized that expert testimony, judicial opinions, and legal treatises "recite the many factors to be considered" and "provide convenient guidelines." *W. L. Moody*, 374 F. Supp. at 480. But it noted that "the unique fact situation of each case renders direct reliance on precedent impossible," and it "deem[ed] several factors particularly significant": the results achieved by receiver; the ability, reputation, and other professional qualities of receiver necessary for job; the size of estate and ability to afford expenses and fees; and the time required to conclude receivership. *Id.* at 480-83.

[10]The Receiver addresses the factors set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), to support his fee application. The Fifth Circuit has not required district courts to evaluate the *Johnson* factors when making fee awards in receiverships (as opposed to awards under civil rights fee-shifting statutes). And because the *Johnson* factors address fee applications by lawyers, and receivers need not be lawyers, it is at least questionable whether the factors should be adopted for all receivership fee applications (a number of the factors do not literally apply to non-lawyers, even if they provide guiding principles for evaluating the fee applications of non-lawyer receivers).

III

A

The court concludes that the Receiver has acted reasonably and diligently and that the requested fees and expenses are reasonable given all the circumstances surrounding the receivership.[11] This receivership arose out of a complex SEC enforcement action alleging violations of § 17(a) of the Securities Act of 1933, § 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder. *See, e.g., Stuart*, 133 U.S. at 82 (recognizing that compensation usually corresponds with "perplexity and difficulty involved in . . . management"); *Byers*, 590 F.Supp.2d at 644 (noting, as a factor, "the complexity of problems faced") (quoting *Fifth Ave. Coach Lines*, 364 F. Supp. at 1222). Defendants received contributions from approximately 700 investors over a period of four years, totaling more than $100 million. Funds were then transferred through more than 40 bank accounts and dispersed among affiliates. The investments involved well interests that were fractionalized into hundreds of sub-interests.

To trace investor proceeds and liquidate assets, it was necessary for the Receiver and the retained firms to be skilled in the areas of oil and gas, securities fraud, bankruptcy, and receivership. *See Stuart*, 133 U.S. at 82 (holding that compensation usually corresponds with "the degree of responsibility and business ability required"); *W. L. Moody*, 374 F. Supp. at

---

[11]The court has considered all of the pertinent factors under *W. L. Moody*, but it need not discuss each one separately and specifically, given the nature of the objections lodged by the Objecting Investors.

481 (recognizing the "[a]bility, reputation and other professional qualities of Receiver necessary for the job"). The Receiver and the retained firms charged fees comparable to those of practitioners with similar experience. *See, e.g., United States v. Code Prods. Corp.*, 362 F.2d 669, 673 (3d Cir. 1966) (noting, as a consideration, "the fair value of such time, labor and skill measured by conservative business standards") (quoting *Croskery v. Roberts & Mander Corp.*, 200 F.2d 150, 154 (3d Cir. 1952)); *City of New Orleans*, 12 F.2d at 19 (giving due consideration for "labor and skill needed or expended"); *FTC v. Consumer Health Benefits Ass'n*, 2011 WL 5513182, at *2 (E.D.N.Y. Nov. 10, 2011) (noting that the "general range of rates for law firm partners and more junior attorneys in this district" is "between $300 and $400 for law firm partners and between $100 and $300 for law firm associates"); *Byers*, 590 F.Supp.2d at 646 (in concluding that hourly rates (e.g., $605 for three associates) for legal services were unreasonably high, noting *SEC v. Cobalt Multifamily Investors I, LLC*, No. 06 Civ. 2360 (S.D.N.Y.), in which the hourly rates charged were between $200 and $220 for associates and $450 and $525.00 for partners at one firm, and $200 for associates and between $300 and $390 for partners at another firm, suggesting that such rates were reasonable). And they expended a reasonable number of hours given the amount of work necessary to recover and dispose of assets in a manner cooperatively with the investors.[12] Moreover, according to the Receiver, an associate was trained early on so

---

[12]It appears that, during the period covered by this third fee application, the individuals principally involved in this case at Munsch Hardt include the Receiver, who charged $340 per hour for the 218.5 hours he billed; a senior securities litigator, who charged from $400 to $425.00 per hour for the 216.9 hours he billed; an associate, who charged from $235.00

that work could be delegated to him to be charged at a lower rate, thereby decreasing the fees incurred; this associate, in fact, billed the majority of the hours (i.e, 851 hours) requested in this application.

During the period covered in this application, the Receiver increased the receivership estate by $1.5 million, for a total recovery of over $5 million in cash and other assets. *See, e.g., Elliott*, 953 F.2d at 1577 ("Whether a receiver merits a fee is based on the circumstances surrounding the receivership, and 'results are always relevant.'") (quoting *W. L. Moody*, 374 F. Supp. at 480)); *Byers*, 590 F.Supp.2d at 648 ("[T]he results achieved and benefit to the receivership estate are critical factors that a court must consider in setting a fee award."). Moreover, in determining the proper disposition of assets, the Receiver cooperated with investor counsel and investors to determine an agreeable approach, including, for instance, utilizing an offering-by-offering approach, turning over of the C&B programs, and conducting an election for the Objecting Investors to decide whether to sell or transfer interests. *See, e.g., Gaskill*, 27 F.3d at 253 ("[A] benefit to a secured party may take more subtle forms than a bare increase in monetary value.") (quoting *Elliott*, 953 F.2d at 1577) (internal quotation marks omitted). The Receiver also responded to investor concerns by, *inter alia*, using a website to update investors and preparing a presentation and answering questions from debenture investors at a court-ordered hearing.

---

to $245.00 per hour for the 851 hours he billed; and a paralegal, who charged $170 per hour for the 233.3 hours she billed. Other persons billed minimal hours and charged comparable rates. Williams & Anderson, who serve as local counsel in Little Rock, Arkansas, charged $140 per hour for the 0.7 hours billed.

Taking into account the fees and expenses awarded to the Receiver in response to his first and second applications, the total requested fees and expenses for this receivership total $749,319.25,[13] or less than 15% of the total recovery of over $5 million[14] in cash and other assets. Such fees are comparable to other fee awards made by judges of this court. *See SEC v. Megafund Corp.*, 2008 WL 2839998, at *2 (N.D. Tex. June 24, 2008) (Lindsay, J.) (in granting fee application, noting that receiver recovered nearly $3.1 million in cash and other assets and that requested fees of $693,642.36 represented 22.4% of total recovery); *SEC v. Funding Res. Grp.*, 2004 WL 2583636, at *2 (N.D. Tex. Nov. 12) (Kaplan, J.) (highlighting that total requested fees and expenses amounted to $1,463,521.15, or less than 30% of total recovery by receiver of more than $5 million in cash and other assets), *rec. adopted*, 2004 WL 2964992 (N.D. Tex. Dec. 20, 2004) (Lynn, J.). And the receivership estate can afford to pay the requested fees and expenses. *See, e.g., W. L. Moody*, 374 F. Supp. at 481 (holding that "[b]ecause of the efforts of Receiver, this estate can well afford to reasonably compensate Receiver and his attorney" (citing cases)). Additionally, the SEC does not oppose the Receiver's fee application, and "acquiescence by the SEC to the fee application will be given great weight." *Byers*, 590 F.Supp.2d at 644 (quoting *Fifth Ave. Coach Lines*, 364 F. Supp. at 1222).

---

[13]*See supra* note 1.

[14]The Objecting Investors mischaracterize the Receiver's recovery when they represent that the Receiver has only collected $1.3 million since his appointment.

B

The court rejects the objections lodged by the Objecting Investors. Without citing any specific deficient narrative, the Objecting Investors first contend that the billing statements are vague. A billing statement that contains "the date, the number of hours spent (calculated to a tenth of an hour), and a short but thorough description of the services rendered" is sufficient to overcome a vagueness challenge, even in the context of a fee-shifting statute. *See, e.g., LULAC v. Roscoe Indep. Sch. Dist.*, 119 F.3d 1228, 1233 (5th Cir. 1997). The court concludes from its review of the Receiver's billing statements that they satisfy these requirements.

The Objecting Investors argue, second, that the Receiver failed to adequately segregate his fees. In *SEC v. AmeriFirst Funding, Inc.*, 2008 WL 919546 (N.D. Tex. Mar. 13, 2008) (Fitzwater, C.J.), this court addressed a similar objection. The defendant contended, *inter alia*, that because the Receiver focused much of his efforts on marshaling assets of one entity, the burden of the fees and expenses should be allocated according to the entities as to whom the Receiver performed work. *Id.* at *2. The Receiver responded that it would be burdensome and further deplete the receivership estate to require that he segregate fees incurred entity-by-entity. *See id*. And he maintained that, because his actions were aimed at benefiting the entire receivership estate, it would be arbitrary to distinguish among fees incurred for each entity. *Id.* This court held that "since the bottom line is increasing the value of the receivership estate as a whole, which directly redounds to the benefit of defrauded investors, there is no reason to require that the Receiver account for the

time he has spent working for each individual receivership entity." *Id.* at *5. Likewise, the Receiver in this case has operated for the benefit of the entire receivership estate, and the Objecting Investors point to no authority that requires fee segregation within the receivership estate. *See SEC v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 332 (5th Cir. 2001) (in rejecting investors' argument that district court had erred in approving fee application that deducted expenses from investor funds because investors did not benefit from receivership, Fifth Circuit noted that investors "cite no authority for this argument, and have made no showing that the district court abused its discretion in approving a plan that would deduct the Receiver's fees and expenses from the total assets prior to distribution").[15]

Accordingly, the court finds and concludes that the Receiver has acted reasonably and diligently and that the requested fees and expenses are reasonable given all the circumstances surrounding the receivership. His fee application is therefore granted in its entirety.

\* \* \*

For the reasons explained, the Receiver's October 13, 2011 third application for payment of professional fees and expenses is granted, and the fee application may be paid

---

[15]The court also rejects the Objecting Investors' argument that because they own the recorded fee title to the working interests in their programs and Striker merely managed their assets, the revenue produced therefrom should not be included in the receivership estate. *See* Dec. 3, 2009 Order Appointing Receiver at ¶¶ 1-2 (defining receivership estate to include receivership records and, in particular, receivership assets—i.e., "assets, monies, securities, properties, real and personal, tangible and intangible, of whatever kind and description, wherever located, and the legally recognized privileges (with regard to the entities), of the Defendant and all entities it owns or controls").

in its entirety out of the receivership estate.[16]

**SO ORDERED.**

March 2, 2012.

*[signature]*
SIDNEY A. FITZWATER
CHIEF JUDGE

---

[16]Although the Objecting Investors complain that the fee application does not address which assets will be used to pay the requested fees and expenses, the court's December 3, 2009 agreed order appointing receiver provides that "fees and expenses shall be paid from the Receivership Estate." *See* Dec. 3, 2009 Order Appointing Receiver at ¶ 5(m).